# EXHIBIT A

IMPARTIAL HEARING OFFICE
NEW YORK CITY DEPARTMENT OF EDUCATION
-----------------------------------------------------------------x
In the Matter of the Due Process Complaint of
PATRICK DONOHUE
on behalf of SARAH JANE DONOHUE

                Petitioners,

                            **MEMORANDUM OF LAW IN**
                            **SUPPORT OF PETITION FOR**
                            **ORDER OF PENDENCY**

       -against-

THE NEW YORK CITY                  IHO No. 175162
DEPARTMENT OF EDUCATION,

                Respondent.
-----------------------------------------------------------------x

## **PRELIMINARY STATEMENT**

      Petitioner, Patrick Donohue ("Parent"), by his counsel, Moshe Indig, submits this Petition

for Order of Pendency, as part of his Due Process Complaint, filed on July 9, 2018, on the

grounds and for the reasons stated herein. In short, Sarah Jane Donohue is entitled to pendency at

the International Institute for the Brain ("iBRAIN") for the 2018-19 school year, as her current

educational program at iBRAIN is substantially similar to the educational program ordered in

IHO Vanessa Gronbach's unappealed Findings of Facts and Decision in IH# 171539, dated April

30, 2018.

      The federal IDEA and New York's Education Law both contain "stay-put" provisions,

which give a student the right to remain in his or her current educational placement at New York

City Department of Education ("DOE") expense during the pendency of any administrative or

judicial proceedings. See 20 U.S.C. § 1415(j); NY Educ. L. 4404(4). Thus, the law allows the

student to remain in his or her "then-current educational placement" until the impartial hearing

process (including all appeals) is complete, unless the parent and DOE agree in writing to an alternative. Id.

Pendency has the effect of an automatic injunction, and the party requesting it need not meet the requirements for injunctive relief such as irreparable harm, likelihood of success on the merits, and a balancing of the hardships. See Zvi D. by Shirley D. v. Ambach, 694 F.2d 904, 906 (2d Cir. 1982). The purpose of pendency is to provide stability and consistency in the education of a student with a disability and "strip schools of the unilateral authority they had traditionally employed to exclude disabled students . . . from school." Honig v. Doe, 484 U.S. 305, 323 (1987); see also T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist., 752 F.3d 145, 170-71 (2d Cir. 2014); Arlington Cent. Sch. Dist. v. L.P., 421 F. Supp.2d 692, 696 (S.D.N.Y. 2006).

Moreover, the courts have unequivocally determined that the failure to grant a student pendency in an "appropriate" program, thereby leaving the student with no pendency placement, is not an option, as a student is entitled to pendency as a matter of law. See, e.g., Gabel ex rel. L.G. v. Bd. of Educ. of Hyde Park Cent. Sch. Dist., 368 F. Supp. 2d 313, 324-26 (S.D.N.Y. 2005) (determining that a settlement agreement, even where limited to a single school year, nonetheless established the student's pendency in the private school where the parties settled for placement, as there was "no other [appropriate] pendency" but that private school). In fact, the courts have characterized the idea of there being no pendency placement for a student as "an impossible result." Id. at 325.

In this matter, Parent asserts that the basis for pendency during the adjudication of their Due Process Complaint lies in IHO Vanessa Gronbach's unappealed Findings of Facts and Decision in IH# 171539, dated April 30, 2018. In the unappealed decision, IHO Gronbach issued the following order:

1. ORDER THAT, the Student shall remain at iHope for the 2017/18 school year, in a twelve-month program, with special education transportation, as outlined in the March 2016 IEP, including a transportation paraprofessional, to and from the school and the home;

2. ORDER THAT, the District shall fund the Student's placement at iHope, by either direct payment to the school or tuition reimbursement to the Parent, in the amount of $144,000.00;

3. ORDER THAT, the District shall fund the Student's related services for the 2017/18 school year, including OT, PT, Speech, Vision, and Parent Counseling and Training, by either direct payment or reimbursement to the Parent, at a rate of $90.00 per hour, specifically: OT = $12,420; PT = $20,700; Speech = $20,700; Vision = $8,280; Assistive Technology = $8,280; Parent Counseling and Training = $1,080;

4. ORDER THAT, the District shall reimburse and/or provide direct payment to the Parent for any private transportation costs for the Student, upon proof of payment or debt owed;

5. ORDER THAT, the District shall fund 1:1 nursing for the Student for the remainder of the school year at a rate of $90.00 per hour;

6. ORDER THAT, the District shall reconvene an IEP meeting to review the Student's program, at a mutually agreeable time, and shall include the Student's teachers, providers and the Parent, within 30 days of this Order.

Ex. B at 12-13. As Sarah Jane is currently enrolled at a different private school, iBRAIN, located at 805 Columbus Avenue, New York, NY 10025, the relevant issue is whether her pendency lies at iBRAIN.[1]

---

[1]     The DOE argued at the pendency hearing that iBRAIN is not substantially similar to iHOPE based on their allegation that iBRAIN does not have a Certificate of Occupancy. Tr. at 32-34. However, the DOE did not provide any positive evidence to support that claim. Moreover, a Certificate of Occupancy is required only for public schools; nonpublic schools may operate without a Certificate of Occupancy. Compare Manual for New York State Public School Facility Fire Safety Inspections, dated January 2017, at p. 11, available at http://www.p12.nysed.gov/facplan/documents/PUBLICFireSafetyManual.pdf (noting that "[s]tudents and employees may not occupy or otherwise use buildings without a valid Certificate of Occupancy") with Manual for New York State Nonpublic School Facility Fire Safety Inspections, dated August 2014, available at http://www.p12.nysed.gov/facplan/documents/NONPUBLICFireSafetyManual.pdf (no reference to Certificate of Occupancy being required for operation as a nonpublic school).

## APPLICABLE LEGAL STANDARDS

A prior unappealed IHO's decision may establish a student's current educational placement for purposes of pendency, as is the case with respect to Sarah Jane Donohue. See Application of the Bd. of Educ. of the Middletown Enlarged City Sch. Dist., Appeal No. 14-035 (citing Student X v. New York City Dep't of Educ., 2008 WL 4890440 at *23 (E.D.N.Y. Oct. 30, 2008); Letter to Hampden, 49 IDELR 197 (OSEP 2007)). In addition, the Second Circuit has described three variations on the definition of "then-current educational placement": "(1) the placement described in the student's most recently implemented IEP; (2) the operative placement actually functioning at the time when the pendency provision of the IDEA was invoked; and (3) the placement at the time of the previously implemented IEP." Dervishi v. Stamford Bd. of Educ., 2016 WL 3548246, at *2 (2d Cir. 2016) (citation omitted).

As noted ante at pp. 1-2, the district is obligated to maintain the student's then-current educational placement during the pendency of the proceedings. See 20 U.S.C. § 1415(j); Educ. L. § 4404(4); 34 CFR 300.518(a); 8 NYCRR 200.5(m). However, the pendency provision does not require a student to receive services at the same school site or location, or from the same service providers; instead, it "entitles the [student] to receive the same general type of educational program." T.M., 752 F.3d at 171 (2d Cir. 1980) (emphasis added) (citing Concerned Parents & Citizens for the Continuing Ed. at Malcolm X (PS 79) v. New York City Bd. of Ed., 629 F.2d 751, 753 (2d Cir. 1980)); see also A.W. ex rel. Wilson v. Fairfax Cty. Sch. Bd., 372 F.3d 674, 682 (4th Cir. 2004) ("'[E]ducational placement' is not the location to which the student is assigned but rather the environment in which educational services are provided."); White ex rel. White v. Ascension Par. Sch. Bd., 343 F.3d 373, 379 (5th Cir. 2003) ("'Educational placement,' as used in the IDEA, means educational program—not the particular institution

where that program is implemented.") (emphasis added); <u>Application of a Student with a Disability</u>, Appeal No. 12-098, at 9 (citations omitted) (a child's "educational placement" should be understood as the "current special education and related services provided in accordance with a child's most recent [basis for pendency],"[2] and not as a specific physical location or school). Therefore, a parent may unilaterally move his or her child from one private school to another as long as the child will continue to receive the "same general type of educational program" at the new private school.[3]

Whether a student's educational program has been maintained under the meaning of the pendency provision depends on whether the current program is "substantially or materially the same" as the student's program for the prior school year. <u>Letter to Fisher</u>, 21 IDELR 992 (OSEP 1994); <u>see, e.g.</u>, <u>Application of the Bd. of Educ.</u>, Appeal No. 02-031 (finding that, to change their son's private school for pendency purposes, parents had to prove that the "educational programs of the two schools are substantially similar")[4]; <u>cf.</u> <u>Application of a Student with a</u>

---

[2]    In this case, IHO Vanessa Gronbach's unappealed Findings of Facts and Decision in IH# 171539, dated April 30, 2018, is Sarah Jane's most recent basis for pendency.

[3]    It should be noted, however, that a parent may not unilaterally transfer his or her child from <u>public school</u> to private school, regardless of program similarity, for purposes of pendency placement. <u>See</u> <u>Vander Malle v. Ambach</u>, 667 F. Supp. 1015, 1028 (S.D.N.Y. 1987) (citations omitted) (finding that where parents remove their child from public school and unilaterally place the child in private school, they do so "at their own risk"); <u>see also</u> <u>Bd. of Educ. of City of New York v. Ambach</u>, 612 F. Supp. 230, 234 (E.D.N.Y. 1985) (citations omitted) (noting that where a parent unilaterally moves his or her child from public school to private school "without the consent of the school agency," the parent does so at his or her own risk); <u>Scokin v. State of Texas</u>, 723 F.2d 432, 438 (5th Cir. 1984) (citation omitted) ("[W]hen a parent unilaterally removes a child <u>from public school</u> and places the child in a private facility . . . the EAHCA does not require the school district to reimburse parents for tuition paid to the private facility.") (emphasis added).
       The takeaway from these cases is that a parent who unilaterally moves his or her child <u>from public school</u> to private school during the pendency of a due process proceeding will not be entitled to pendency at the private school. Such a conclusion makes sense, as a move from public school to private school will always disrupt the status quo as, by definition, public schools and private schools are not substantially similar.
       However, two private schools can be substantially similar and, as discussed <u>ante</u> at pp. 5-6, SROs have found pendency to be warranted at the new private school where that is the case.

[4]    In <u>Application of the Bd. of Educ.</u>, Appeal No. 02-031, the parents chose to enroll their son in a private school named Old Forge for school year 2001-02 despite their son's pendency placement for that year being at a private school named Maplebrook. Their argument for pendency at Old Forge was that Old Forge's educational

Disability, Appeal No. 16-020 (finding that because the record did <u>not</u> establish that student's

current program was substantially similar to the preschool program he had previously attended, it

could not be his placement for pendency purposes) (emphasis added).

OSEP identified a number of factors to consider in analyzing the issue of substantial

similarity, including: whether the educational program in the student's IEP has been revised;

whether the student will be educated with nondisabled peers to the same extent; whether the

student will have the same opportunities to participate in nonacademic and extracurricular

services; and whether the new placement is the same option on the continuum of alternative

placements. See Letter to Fisher, 21 IDELR at 992.

In sum, pendency relief must be granted where "the educational program [at issue] is

'substantially and materially the same' as the student's educational program for the prior school

year" regardless of whether the student's previous program is available. Application of a Student

with a Disability, Appeal No. 12-098 at 11.[5]

### SARAH JANE IS ENTITLED TO PENDENCY AT iBRAIN

---

program was substantially similar to the one at Maplebrook. For various reasons, including that the student was enrolled in a residential program at Old Forge while he was only a day student at Maplebrook, the SRO found that the two programs were not substantially similar and, thus, Old Forge could not be the student's pendency placement.

Notably, the SRO based its decision solely on the lack of substantial similarity between the two schools, and not on whether the student could have continued to attend Maplebrook. This is a crucial aspect of the decision. If the availability of the first school (Maplebrook or iHOPE) was dispositive for purposes of whether pendency is a possibility at the second school (Old Forge or iBRAIN), as the DOE has argued, the SRO would have based its denial of pendency at Old Forge on Maplebrook's availability without ever reaching the issue of substantial similarity.

[5]      Application of a Student with a Disability, Appeal No. 12-098, involved a case where, after the student attended a 10:1+2 class within a preschool for the 2010-11 school year, the parent unilaterally moved the student to a private school called Seton for the 2011-12 school year, where the student attended a 12:1+1 class for kindergarten. On appeal, the State Review Officer found that the parent was not entitled to pendency relief because the unilateral change from a 10:1+2 class to a 12:1+1 class <u>precluded a finding that the two educational programs were substantially similar</u>. <u>Id.</u> at 11 (emphasis added). In other words, had the SRO found the two educational programs to be substantially similar, he would have found that that parent was entitled to pendency relief at the new private school.

In this case, while Parent changed Sarah Jane's "bricks and mortar" placement from the International Academy of Hope ("iHOPE") to the International Institute for the Brain ("iBRAIN") for the 2018-19 school year, Sarah Jane's educational program at iBRAIN is substantially similar to the one at iHOPE. Such similarity was established through testimony of iBRAIN's Director of Special Education, Ms. Tiffany Semm at the August 14, 2018 hearing.

Ms. Semm testified to the following regarding Sarah Jane's current educational program at iBRAIN. Sarah Jane is currently a student at iBRAIN in a 6:1:1 special class. Tr. at 100-01. Sarah Jane has a full-time 1:1 paraprofessional and 1:1 nurse.[6] Id. at 88. Sarah Jane receives the follow related services, weekly: Physical Therapy (5x60, 1:1); Occupational Therapy (3x60, 1:1); Speech and Language Therapy (5x60, 1:1); Vision Education[7] (3x60, 1:1); and Assistive Technology Services (2x60, 1:1). Id. at 94-95. Sarah Jane also has a parent counseling and training mandate of 1x60 monthly.[8] Id. at 95. Finally, upon information and belief, Sarah Jane has special transportation accommodations.

As described in IHO Gronbach's decision, Sarah Jane's educational program at iHOPE was as follows. Sarah Jane was in a 6:1:1 special class. Ex. B at 6. She had a full-time 1:1 paraprofessional and 1:1 nurse. Id. at 6, 13. She received the following related services, weekly:

---

[6]     That Sarah Jane receives 1:1 nursing is not stated directly in the transcript; however, it is implied given her medically fragile condition. Tr. at 88. Upon information and belief, Sarah Jane does, in fact, receive 1:1 nursing.

[7]     At the time of the hearing, iBRAIN did not yet have a vision education teacher. Tr. at 117. However, Ms. Semm explained in great detail that Sarah Jane's vision goals were still being implemented as part of her overall program. Id. at 96-100, 112. Moreover, upon information and belief, iBRAIN is currently staffed with vision education teachers. Given that the standard is "substantial similarity" and not "identicality," minor differences in one of many related services for a minimal portion of the school year should not be dispositive on the issue of "substantial similarity."

[8]     DOE argued that iBRAIN was unable to provide Parent Counseling and Training during the first month of the school year. Tr. at 118. They are mistaken. The first month of the school year went from July 9, 2018 to August 9, 2018, and iBRAIN hired a social worker on August 1, 2018. Id. As Parent Counseling and Training is a related service provided to Sarah Jane's parent only once per month, the social worker began working at iBRAIN with more than enough time to provide the necessary counseling and training.

Physical Therapy (5x60, 1:1); Occupational Therapy (3x60, 1:1); Speech and Language Therapy (5x60, 1:1); Vision Education (2x60, 1:1); and Assistive Technology Services (2x60, 1:1). Id. at 6-7, 13. Sarah Jane had a parent counseling and training mandate of 1x60 monthly. Id. at 7, 13. Sarah Jane also had special transportation accommodations. Id. at 12-13. Finally, it should be noted that Ms. Semm testified, based on her experience working for both iHOPE and iBRAIN, that Sarah Jane's educational program at iHOPE for school year 2017-18 was substantially similar to her educational program at iBRAIN for school year 2018-19. Tr. at 100-01.[9]

### PARENT RESPECTFULLY REQUESTS THAT<br>IHO LLOYD RECUSE HIMSELF FROM THIS CASE

"[I]t is well settled that an IHO must be fair and impartial and must avoid even the appearance of impropriety or prejudice." Application of a Student with a Disability, Appeal No. 13-212 at 16 (emphasis added) (citing Application of a Student with a Disability, Appeal No. 11-144; Application of the Bd. of Educ., Appeal No. 10-097; Application of a Student with a Disability, Appeal No. 10-018; Application of a Student with a Disability, Appeal 10-004; Application of a Student with a Disability, Appeal No. 09-084; Application of the Bd. of Educ., Appeal No. 09-057; Application of a Student with a Disability, Appeal No. 09-052; Application of a Student with a Disability, Appeal No. 08-090); see 22 NYCRR 100.1, 100.2(A), 100.3(B).

---

[9]    At a minimum, Sarah Jane is entitled to pendency for (1) all related services, (2) her 1:1 paraprofessional, (3) special transportation accommodation, and (4) any other services that overlap between iHOPE and iBRAIN. See DOE v. E. Lyme Bd. of Educ., 790 F.3d 440, 453 (2d Cir. 2015) (citation omitted) (holding that the "stay-put provision" can be applied to portions of a parent's requested pendency); Application of the New York City Dep't of Educ., Appeal No. 10-112 at 5-6 (citations omitted) ("[I]n order to comply with its obligations under pendency, 'the public agency must provide those special education and related services that are not in dispute between the parent and the public agency.' . . . The district has not provided a sufficient legal basis for its argument that the parents must accept either all or none of the student's previously agreed upon special education and related services identified in the March 2008 IEP."); Application of the New York City Dep't of Educ., Appeal No. 10-107 at 4 (citing 34 C.F.R. § 300.518(c)) (finding that district is required to "provide those special education and related services that are not in dispute between the parent and the public agency"); Application of a Student with a Disability, Appeal No. 08-050 at 12 (ordering district to fund part of student's then-current placement under pendency because student's withdrawal from a private school "only frustrates a portion of his then-existing placement").

Appearance of impropriety or prejudice will be found where an IHO's conduct "would create in reasonable minds a perception that the [IHO's] ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired." N.Y. Code of Judicial Conduct, Canon 2.2, McKinney's Consol. Laws, Book 29 App. Additionally, state regulation provides that an IHO "'shall not have a personal or professional interest which would conflict with his or her objectivity in the hearing.'" Application of a Child Suspected of Having a Disability, Appeal No. 94-025 (citing 8 NYCRR 279.1(s)(1)).

IHO Lloyd Has Shown Bias Toward Both Parent and Counsel

On several occasions during the course of the pendency hearing, IHO Lloyd asked accusatory and palpably irrelevant questions about Parent and counsel that create a significant appearance of bias. For example, after counsel explained that 50 West 97th Street was location of his office, IHO Lloyd conducted a 7-page examination of counsel, asking him about details regarding his law office, its corporate structure, and staff as well as regarding his registered professional address with the bar association. Tr. at 38-43. In the course of this examination, IHO Lloyd made several accusatory comments toward counsel in which he seemingly questioned counsel's integrity due to counsel's lack of intimate knowledge regarding the corporate structure of the law office at which he works. For example, see the following exchange in which IHO Lloyd questioned counsel regarding the corporate structure of his law office:

> HEARING OFFICE LLOYD: You happen to be an attorney, but the Brain Injury Rights Group is not an LLP or a law firm?
>
> MR. INDIG: It's an LTD. I'm not sure exactly how—what they do—
>
> HEARING OFFICE LLOYD: (Interposing) Is it a law firm? Careful. You're on the record.

MR. INDIG: I'm going to say that I cannot answer that question at this time. If you want me to give you a hundred percent answer right now—

HEARING OFFICE LLOYD: (Interposing) No, you said it was a law firm. I want to know what the name of the firm is. You have not—

MR. INDIG: (Interposing) Based on—that's based on my understanding.

HEARING OFFICE LLOYD: Well, then, then, then, you should not be repeating that if you don't know the answer. You should not be identifying that the Brain Injury Rights Group is a law firm. It is not.

MR. INDIG: Okay.

HEARING OFFICE LLOYD: Unless you can tell me what law firm it is.

MR. INDIG: Okay.

Id. at 40-41. Later in the hearing, IHO Lloyd confirmed that he had previously been questioning counsel's integrity. Id. at 74 (counsel responded to a question from IHO Lloyd by stating "I don't know" to which IHO Lloyd responded, "Okay, look, that's an honest answer."). That IHO Lloyd would question counsel regarding the corporate structure of his law office—patently irrelevant information for a pendency hearing—and then question his integrity due to his inability to answer such questions with complete confidence creates an appearance of bias against counsel.

In regard to bias against Parent, IHO Lloyd made it very clear that he would allow unverified allegations from a federal complaint summarized on the record by the DOE (id. at 20-28)—regarding Parent's role in the forming of both iHOPE and iBRAIN—affect his decision as to Sarah Jane's right to pendency at iBRAIN. IHO Lloyd stated:

Mr. Patrick Donohue brings a challenge to the Department of Education for failure to provide FAPE and requests that pendency be swapped or switched from iHOPE where he was the former chairman . . . to now the institution that he's the chairman of the

board for currently. . . . [T]he Department has made an allegation that Mr. Patrick Donohue is acting improperly either in his law practice or in his position as chairman of the board of one institution and then swapping to another institution or in some kind of way that was not really specified.

Id. at 66. Further demonstrating bias against Parent, IHO Lloyd subsequently refused to hear additional background information regarding the iHOPE and iBRAIN from counsel. That exchange was as follows:

HEARING OFFICE LLOYD: (Interposing) I'm just trying to get the facts straight of who shot John, when, what kind of gun was used, and where did he fall. Now, I'm just trying to logically understand what happened, when it happened, and then trying to draw some conclusions about what it all means.

MR. INDIG: Right. So I mean, as part of—I mean, like, it's not only [Mr. Donohue's] daughter that's at this iBRAIN school—

HEARING OFFICE LLOYD: (Interposing) The only case that I've got in front of me is his daughter's case.

. . .

HEARING OFFICE LLOYD: (Interposing) So when you bring in other children, it does not have any bearing on this case.

. . .

MR. INDIG: My point is that if we're going to start looking at the outside circumstances of his daughter moving there, then it's also important to note that the majority of the students who are iHOPE are also at iBRAIN now.

HEARING OFFICE LLOYD: Why is that important?

MR. INDIG: Because it paints the picture. It gives you a fuller picture of what's going on—

HEARING OFFICE LLOYD: (Interposing) The only picture I'm concerned with now is the relationship between iHOPE, the formerly adjudicated placement of this student, iBRAIN, the requested alternative placement by the parent, and the parent and the

> student around which this whole ball of wax encompasses Sarah Jane Donohue. That's what I'm interested in.
>
> So whether or not 50 students also move from one institution to another, whether their parents made some decisions, all of that is beyond the scope of my interest.
>
> However, I must pay attention to what happened in this case. Is iHOPE out of business?

Id. at 68-69. In short, while IHO Lloyd stated that he was trying to learn as much as possible about iHOPE and iBRAIN, his receptiveness was limited to hearing negatively-skewed information about Parent. When counsel attempted to share crucial background information about enrollment changes at iHOPE and iBRAIN that would provide IHO Lloyd with a fuller picture of the two schools as well as Parent's relationship to them, IHO Lloyd refused to hear such information, claiming it was irrelevant. If IHO Lloyd was truly unbiased and wanted to fully understand the background of this case, he would not have limited his receptiveness to information that painted Parent in a negative light.

For the aforementioned reasons, Parent respectfully requests that IHO Lloyd recuse himself from this case and allow Sarah Jane to receive a fair hearing absent even the slightest appearance of bias.

## **CONCLUSION**

As such, Parent respectfully requests an Order of Pendency, retroactive to the date of the

Due Process Complaint, that the DOE prospectively pay for Sarah Jane's Full Tuition at iBRAIN

(which includes academics, therapies, and a 1:1 paraprofessional during the school day) and

special transportation accommodations (which includes limited travel time of 60 minutes, a

wheelchair-accessible vehicle, air conditioning, flexible pick-up/drop-off schedule, and a

paraprofessional).

Dated: September 26, 2018

Respectfully submitted,

/s/

_____
Moshe Indig, Esq.
Attorney for Parent
Brain Injury Rights Group
50 W. 97th St., Suite 1E
New York, NY 10025

# EXHIBIT B

Interim Order on Pendency.

Case Number: 175162

Student's Name:   Donohue, Sarah Jane

Date of Birth:       June 5, 2005

District:  Service District

Hearing Requested By:    Parent

Date of Hearing:    September 9, 2018

Hearing Officer:    Michael Kennedy Lloyd, Esq.

NAMES AND TITLES OF PERSONS WHO APPEARED  August 29, 2018

Moshe Indig, Esq.              Attorney                    Parent


Elizabeth Marris, Esq.         Attorney                    NYCDOE

The matter of Sarah D. came before me on September 6, 2018.  The date of my designation as the Impartial Hearing Officer, pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.c. s. 1415(f)(1) was August 22, 2018.  The hearing was convened at the request of the parent, which was received on July 10, 2018.  This Pendency Hearing was held on September 6, 2018.

The student is 13 years old  attending a 12 month program at a non-public placement (I-Brain) determined by the Parent.   Previously the student attended a placement (I-Hope) resulting from a prior unappealed decision of an impartial hearing (IHO case 171539 decided April 30, 2018) see Exhibit B.  The services provided in that decision are (1) tuition funding of $144,000 plus the cost of related services as specified in the prior Order for a 12 month placement at I-Hope (2) special education transportation (3) a transportation paraprofessional (4) related services of occupational therapy, physical therapy, speech and language therapy, vision therapy and parent counseling and training with 1:1 nursing for the student, each at a rate of $90 per hour.

It appears that the student has been attending I-Hope for several prior years  with the recent 2017 - 2018 school year attendance a result of the aforementioned Order. Parent acknowledges that the basis for pendency placement lies with the above Order. Parent alleges I-Brain is substantially similar to I-Hope.  Tr. pgs. 49-55.  The tuition at I-Brain is $148,000 per annum plus the costs of aforementioned related services.  Parent makes no allegation concerning I-Hope indicating any failure or inability to provide the services per the prior Order.

The NYCDOE acknowledges the pendency placement commences from the date of filing of this Demand July 2, 2018 and asserts that pendency lies at the I-Hope institution consistent with the prior Order.  The NYCDOE alleges that Parent has not filed a ten-day notice indicating any change of placement but does acknowledge receipt of Parent's Due Process Complaint and does not consent to the change of school by the parent.

The backdrop to this controversy is that Parent was formerly the Chairman of the Board of I-Hope and as of recent has established I-Brain on parallel concepts and services and is currently Chairman of the Board at I-Brain  (Exhibits 1 and 4; Tr.p. 62-67).  Parent seeks to transfer the pendency placement of the student to this new institution.

The parties have each filed briefs on the contested pendency placement, the NYCDOE has submitted IHO 1 (with 3 attachments) and Parent has submitted IHO 2 (with 27 attachments).

Pendency commences with the filing of a Demand for an Impartial Hearing according to SRO 11-154 which held;

a due process proceeding must be pending (Application of a Student with a Disability, Appeal No. 08-050; Application of a Child with a Disability, Appeal No. 07-136; see20 U.S.C. § 1415[j]; Educ. Law § 4404[4]; 34 C.F.R. § 300.518[a]; 8 NYCRR 200.5[m]; Honig v. Doe, 484 U.S. 305, 323 [1987]; Mackey v. Bd. of Educ., 386 F.3d 158, 160 [2d Cir. 2004]; Bd. of Educ. v. Schutz, 290 F.3d 476, 481-82 [2d Cir. 2002]; Letter to Winston, 213 IDELR [OSEP 1987]). In this case, the proceeding began with the February 11, 2011 filing of the parents' due process complaint notice (see Dist. Ex. 11; Answer ¶ 18). As a consequence, the right to invoke the student's pendency placement did not arise until February 11, 2011 (Application of a Student with a Disability, Appeal No. 08-050; Application of a Child with a Disability, Appeal No. 07-136). Therefore, I agree with the district that it was not until this date that the district was financially responsible for the costs of the student's pendency placement at Winston Prep (see Weaver v. Millbrook Cent. Sch. Dist., 2011 WL 3962512, at * 8 [S.D.N.Y. Sept. 6, 2011]). The impartial hearing officer's July 2011 interim decision at best, unclear;16 however, the matter was later clarified in her final decision, which indicated that the student was entitled to pendency on February 11, 2011 (IHO Decision at p.25).

The entitlement to pendency is carefully explained in <u>Application of a CHILD WITH A DISABILITY</u> 01-023:

"The relief that petitioners seek is available to them as a matter of law because of the pendency provisions of federal and state law (20 U.S.C. §1415 [j]; New York Education Law § 4404[4]). The pendency provisions apply even when a child is transitioning from preschool to a school-age program (<u>Application of a Child with a Disability</u>, Appeal No. 96-48; <u>Application of a Child with a Disability</u>, Appeal No. 00-037; <u>Application of a Disability</u>, Appeal No. 01-003). Pendency protects against a unilateral change in a child's placement, such as a material alteration of a student's educational program. It does not mean that a child must remain in a particular site or location (<u>Application of the Board of Educ.</u>, Appeal No. 99-90), or at a particular grade level (<u>Application of a Child with a Disability</u>, Appeal No. 95-16). Pendency has the effect of an automatic injunction, which is imposed without regard to such factors as irreparable harm, likelihood of success on the merits, and a balancing of the hardships (<u>Zvi D. v. Ambach</u>, 694 F. 2d at 904 [2d Cir. 1982]; <u>Drinker v. Colonial School District</u>, 78 F. 3d 859 [3d Cir. 1996])."

The question of parent's right to unilaterally transfer their child from one school to another is addressed in Application of the Bd. Of Educ., Appeal No. 00-073 see also Bd. Of Educ. V. Ambach, 612 F. Supp. 230 as referenced in Application of a Student with a Disability, Appeal No. 12-098, "even though a change in location does not necessarily constitute a change of placement parents are not free to unilaterally transfer their child from one school to another".  In this instance there has been no showing of any inability of I-Hope to execute the unappealed prior Order.

I Order the NYCDOE to provide pendency funding for placement of the student at I-Hope from the date of filing of this due process complaint (July 10, 2018) during the pendency of these proceedings.  The pendency placement is  So Ordered.

This matter is adjourned until October 16, 2018 at Noon.


DATED: October 4, 2018.

*Michael Kennedy Lloyd, Esq.*
Michael Kennedy Lloyd, Esq.
Impartial Hearing Officer


**PLEASE TAKE NOTICE**

**The parent and/or the New York City Department of Education has a right to obtain a review of this decision by a State Review Officer of the New York State Education Department under Part 200.5(k) of the Regulations of the Commissioner of Education, Section 4404 of the Education Law, and the Individuals with Disabilities Education Act. The Department of Education has designated the New York City Law Department to accept service of papers on its behalf, including appeals of decisions of Impartial Hearing Officers. Such service is made at 100 Church Street, New York, NY 10007 at the Messenger Center.**

# EXHIBIT C



Alani McCoy <alani@pabilaw.org>

## Fwd: IH# 175162 (DONOHUE, SARAH JANE) - MEMORIALIZATION OF OFF-THE-RECORD CONFERENCE CALL

1 message

**Moshe Indig** <moshe@pabilaw.org>                                           Fri, Oct 12, 2018 at 12:44 PM
To: Alani McCoy <alani@pabilaw.org>


---------- Forwarded message ---------
From: **Moshe Indig** <moshe@pabilaw.org>
Date: Wed, Oct 10, 2018 at 5:10 PM
Subject: IH# 175162 (DONOHUE, SARAH JANE) - MEMORIALIZATION OF OFF-THE-RECORD CONFERENCE CALL
To: Torres Adrianna <ATorres78@schools.nyc.gov>
Cc: M. K. Ll. <mklesq@gmail.com>, Marris Elizabeth <EMarris@schools.nyc.gov>, Karl Ashanti <karl@pabilaw.org>,
William Frazier <william@pabilaw.org>


Dear Ms. Torres,

I am writing to memorialize a pre-hearing conference call that took place earlier today with IHO Lloyd and DOE Attorney,
Lizzie Marris.

IHO Lloyd called both Ms. Marris and myself for an unscheduled conference call that took place off the record. I was not
informed that the call was not on the record until a few minutes into the phone call. Upon being informed that we were off
the record, I requested that the conference call be put on the record, stating that I was not comfortable with having an
important conference without a record. IHO Lloyd refused to put the call on the record.

The conference call then addressed the following issues:

1) IHO Lloyd stated that the hearing would take place at 131 Livingston Street, Room 507. He stated that the room can
hold 25-50 people. I responded that Parent requested a room that can fit 100-200 people, as that was our estimation of
the number of attendees. I then argued that without such a venue, Parent's request that hearing be an "open hearing"
was effectively being rejected, as a hearing where only some of the public can attend is by definition not "open." At this
point, I requested that the phone call be on the record, so my objections to this issue would be noted but IHO Lloyd
refused. He stated that I can voice my objections at the hearing to which I responded that Parent would have no recourse
at that point, as refusing an "open hearing" is not reversible error. IHO Lloyd continued to refuse to put the phone call on
the record.

2) I reiterated Parent's request that the media be allowed to record the hearing with video or audio equipment to which
IHO Lloyd denied the request. He stated that state and federal court law do not allow such recording. I responded by
citing to Part 131 of Rules of the Chief Administrative Judge in New York that states such recording is allowed under
certain circumstances and that a judge can refuse to allow such recording if he or she provided a reason for making such
a denial. I also cited to Local Rule 7 of New York Federal District Court law, which New York Federal District Courts have
interpreted to allow such recording in many circumstances, particularly where the basis of the hearing is of the public's
interest. IHO Lloyd responded that this hearing is not in the public's interest because it is about only one student. I
responded that this case implicates the rights of hundreds if not thousands or even more students in New York and
across the country. I plan to follow up with a more formal brief addressing this legal issue and requesting that a ruling be
provided on the record prior to the hearing, so that Parent will have the opportunity to file for an emergency injunction
requiring the IHO to allow recording of the hearing, so the public, whose interest is greatly implicated, will be able to follow
the hearing.

3) I reiterated Parent's request that IHO Lloyd recuse himself from the case due to bias show toward Parent and myself,
and asked him if he had intentionally not ruled on that issue in his Pendency Order. He stated that the recusal request did
not belong in my brief on pendency. After further discussion as to whether IHO Lloyd would confirm that he intentionally
refused to decide the issue in the pendency hearing, which he refused to confirm, I made a formal request during that
phone that he recuse himself from the case to which he responded, "denied."

4) Additional issues discussed in the phone call included the subpoenas which Parent filed requesting document disclosure from iHOPE and the DOE and in-person testimony from several DOE/CSE employees. IHO Lloyd stated that he signed the iHOPE and DOE subpoenas and made some statements regarding the need for Parent to submit a separate subpoenas requesting document disclosure from CSE as well as some statements regarding the DOE subpoena. As they were not completely clear, I will not be memorializing them in this email. My current understanding is that the IHO wants Parent to submit a new subpoena requesting document disclosure of conversations between DOE Office of Legal Services attorneys but that the DOE will be required per the signed subpoena to provide any other documentation regarding S.D., the student, that is in their possession.

In regard to the new subpoena regarding conversations between DOE Office of Legal Services attorneys, the IHO refused to consider an email thread in which such attorneys previously conspired to violate the rights of S.D. and other similarly situated. That email thread demonstrates that the work-product exception to discovery was generally waived. <u>See</u> <u>Fullerton v. Prudential Insurance Co.</u>, 194 F.R.D. 100, 103 (S.D.N.Y. 2000) (citations omitted) ("Generally, the work product privilege is waived when protected materials are disclosed in a manner which is either inconsistent with maintaining secrecy against opponents or substantially increases the opportunity for a potential adversary to obtain the protected information."). Disclosure of confidential attorney conversations to Parent is "inconsistent with maintaining secrecy against opponents" and "substantially increases the opportunity for a potential adversary to obtain the protected information." <u>Id.</u> Moreover, the "crime-fraud" exception applies to such attorney conversations, as the email thread was a discussion among 25 attorney in the DOE's Office of Legal Services where such attorneys conspired to violate the rights of dozens of students. <u>See Meyer v. Kalanick</u>, 212 F. Supp. 3d 437, 443–44 (S.D.N.Y. 2016) (citing <u>In re Richard Roe, Inc.</u> <u>(Roe II)</u>, 168 F.3d 69, 71 (2d Cir.1999)) ("The crime-fraud exception applies when there is (i) a determination that the client communication or attorney work product in question was itself in furtherance of the crime or fraud and (ii) probable cause to believe that the particular communication with counsel or attorney work product was intended in some way to facilitate or to conceal the criminal activity."). As such, correspondence between attorneys in the DOE Office of Legal Services is not protected and IHO Lloyd must accordingly issue a subpoena for their disclosure. For memorialization purposes, the relevant email thread is attached to this email.

The IHO also requested that Parent submit separate subpoenas for each person Parent wants to appear at the impartial hearing and that the DOE will have an opportunity to object to them in response to which Parent will have a chance to argue for why each subpoena should be signed.

5) IHO Lloyd requested the DOE to inform myself regarding which witness they plan to call first at the hearing next Tuesday.

6) Parent requested an adjournment of the upcoming impartial hearing to address these crucial issues that involve the rights of the student prior to the beginning of the impartial hearing. Parent noted that S.D. would have no possibility of legal recourse should these issues not be addressed before the impartial hearing begins. Parent formally reaffirms this request in this email.

Parent requests that this memorialization be added to the record in the case. Parent also requests information regarding how and to whom it can appeal IHO Lloyd's refusal to grant Parent an "open hearing."

Thank you in advance for your continued assistance on this case.

Best regards,

Moshe Indig
Attorney for Parent

 **2015-08-21 Email correspondence within NYC DOE OLS.pdf**
924K

# EXHIBIT D

IMPARTIAL HEARING OFFICE
NEW YORK CITY DEPARTMENT OF EDUCATION
------------------------------------------------------------------x
In the Matter of the Due Process Complaint of
PATRICK DONOHUE,
on behalf of S.D.,

                                Petitioner,

                                                       **MEMORANDUM OF LAW IN SUPPORT OF REQUEST PERMITTING AUDIO-VISUAL RECORDING AND/OR BROADCASTING OF S.D.'S OCTOBER 16, 2018 IMPARTIAL HEARING**

         -against-

THE NEW YORK CITY
DEPARTMENT OF EDUCATION,                         IHO No. 175162

                                Respondent.
------------------------------------------------------------------x

## PRELIMINARY STATEMENT

Petitioner, Patrick Donohue ("Parent"), by his counsel, Moshe Indig, submits this memorandum of law on the grounds and for the reasons stated herein. In short, S.D. is entitled to an "open hearing" with the attendance of media members who will record and/or broadcast her October 16, 2018 impartial hearing using audio-visual equipment, as permitted under both state and federal law.

In an email on October 4, 2018, Parent requested that S.D.'s impartial hearing be an "open hearing," which is Parent's right under 8 NYCRR § 200.5(j). Parent also requested that IHO Lloyd schedule a pre-hearing conference call, which was subsequently scheduled for October 9, 2018.

During that pre-hearing conference call, IHO Lloyd stated that, while print media would be allowed to attend the impartial hearing, he would not allow audio-visual media because state

and federal law prohibit such recording of hearings.[1] He did not cite to any specific authority to support his position. Parent asserts that state and federal law, contrary to IHO Lloyd's position, permit the recording of hearings and that where the presiding judge wants to make a specific ruling prohibiting such recording, he or she must provide a reasonable basis for such a ruling.

## ARGUMENT

In the Rules of the Chief Administrative Judge, 22 NYCRR § 131.1(3), it states that "it is the policy of the Unified Court System to facilitate the audio-visual coverage of court proceedings to the fullest extent permitted by the New York Civil Rights Law and other statutes, as interpreted by New York courts." As relevant to this case, audio-visual coverage is presumptively permitted under New York Administrative Procedural Law except during specific portions of a hearing. Id. at (b)-(c). Moreover, the relevant provision stresses that it is the administrative judge's responsibility to "take whatever steps are necessary" to ensure audio-visual coverage is conducted with proper decorum. Id. at (g). If audio-visual coverage were prohibited absolutely, the administrative judge would have no such steps to take.

Alternatively, Parent asserts that federal court procedure is controlling in this instance, as education rights are a matter of federal law under the Individuals of Disabilities Education Act ("IDEA"), which applies to this case. As such, the Federal Rules of Civil Procedure is the proper authority upon which to base a determination regarding audio-visual coverage at S.D.'s impartial hearing.

In E*Trade Fin. Corp. v. Deutsche Bank AG, 582 F. Supp. 2d 528, 532-33 (S.D.N.Y. 2008) (citation omitted), the court stressed that "[t]he trend has been toward increasing

---

[1]   During an unscheduled pre-hearing conference call on October 10, 2018, which IHO Lloyd refused to hold on-the-record despite Parent's request therefor, Parent reiterated his request for audio-visual media to be permitted at the "open hearing." IHO Lloyd again denied Parent's request without citing any specific authority to support his position.

2

openness—in this district and other federal and state courts. Local [Civil] Rule 7[2] was amended

effective June 30, 1988, to give a presiding judge discretion to permit the recording and

broadcast of court proceedings." The court then noted several reasons why allowing the

recording and broadcast of the court proceeding at issue in its opinion was proper:

> First, this is a bench trial. Further, this is not a high-profile case, and
> will not be broadcast for a general audience. Thus, the impact upon
> a witness of the knowledge that he is being viewed by a vast
> audience is not an issue. Nor will the recording and narrowcasting
> of the trial place a significant additional burden upon the Court.
> CVN will utilize a single stationary camera, and has agreed to place
> a light indicating whether the camera is on in the common view of
> counsel and the Court. The camera will be turned off if and
> when proceedings are    closed    to    the    public.    Finally,
> CVN's coverage will be gavel-to-gavel, ameliorating concerns with
> regard to sensationalized or selective coverage.

Id. at 535. Like in E*Trade, the current case is (1) a bench trial, (2) will likely not be broadcast to

a general audience, and (3) the broadcasting will not place a significant burden on the court.

In In re Zyprexa Prod. Liab. Litig., No. 04-MD-1596 (JBW), 2008 WL 441896, at *1

(E.D.N.Y. Feb. 11, 2008), the court held, based on Local Civil Rule 1.8, that broadcasting of the

hearing would be allowed unless a party objected, at which point a hearing would be held to

address the objection. The court explained that "[i]n view of the fact that tens of thousands of

individuals, organizations and governmental entities all over the United States are affected by the

instant litigation, approval of the application may be in the public interest." Id. The reasoning for

permitting broadcasting of the hearing in Zyprexa applies here, as—where there are hundreds if

not thousands or more children in New York and the rest of the country who suffer from brain

---

[2]    Based on a review of the Local Rules of United States District Courts for the Southern and Eastern Districts
of New York, the court in E*Trade Fin. Corp. v. Deutsche Bank AG, 582 F. Supp. 2d 528, 532-33 (S.D.N.Y. 2008)
appears to be referring to Local Civil Rule 8 as opposed to Rule 7.

injuries and require proper education—the public has a significant interest in observing S.D.'s

hearing.[3]

In Katzman v. Victoria's Secret Catalogue, 923 F. Supp. 580, 586 (S.D.N.Y. 1996), the

court stressed the "overwhelming positive impact" that results from the presence of cameras at

hearings. It cited to the study of a Pilot Program produced by the Federal Judicial Center, which

concluded, among other things:

> 1) Overall, attitudes of judges toward electronic media coverage of
> civil proceedings were initially neutral and became more favorable
> after experience under the pilot program.
>
> 2) Judges and attorneys who had experience with electronic
> media coverage under the program generally reported observing
> small or no effects of camera presence on participants in
> the proceedings, courtroom decorum, or the administration of
> justice.
>
> 3) Judges, media representatives, and court staff found the
> guidelines governing the program to be generally workable and
> judges and court staff report[ed] that members of the media were
> very cooperative and complied with the program guidelines and any
> other restrictions imposed.

Id. (citations omitted, brackets in original). As a result of these findings, the Case Management

Committee overseeing the study recommended that camera coverage of civil proceedings "be

made permanent and be extended to all federal courts." Id. at 587. The court then cited a report,

which had found that "reporting on court proceedings, both by newspaper and broadcast

reporters, frequently is more accurate and comprehensive when cameras are present." Id. (citing

Report of the Committee on Audio—Visual Coverage of Court Proceedings, at 91) (emphasis

---

[3]     While IHO Lloyd has previously stated that S.D.'s hearing is not of the public's interest, the court in
Katzman v. Victoria's Secret Catalogue, 923 F. Supp. 580, 587-88 (S.D.N.Y. 1996) found that "it is particularly
inappropriate for any court to exercise its discretionary powers so as to restrict access to information for the sole
reason that the subject matter of a proceeding is deemed by the court not to be newsworthy."

added). "Even small portions of televised coverage can add to the informational value of a reporter's summary of events." Id.

In addition to audio-visual recordings of proceedings adding value to a reporter's reporting on a hearing, such recordings also ensure that reporters have an accurate recollection of the hearings and thus, report on them accurately. As the court in Katzman noted, "courts cannot control editorial judgments by journalists . . . for to do so would be plainly at odds with the First Amendment." Katzman, 923 F. Supp. at 587 (citing Craig v. Harney, 331 U.S. 367, 375 (1947) for the holding that a reporter cannot constitutionally be held in contempt of court for unfairly summarizing trial proceedings).[4]

Finally, the court in Katzman concluded, citing to Justice Stewart's concurring opinion in Houchins v. KQED, Inc., 438 U.S. 1, 17 (1978) (Stewart, J., concurring), that "in the context of the right of press access to the courtroom, there can no longer be a meaningful distinction between the print press and the electronic media." Katzman, 923 F. Supp. at 588-89. While courts have not gone as far as holding that there was a First Amendment right to televised hearings, it did stress:

> Twelve years after the Westmoreland[ v. Columbia Broadcasting Sys., Inc., 752 F.2d 16, 22 (2d Cir.1985)] decision and twenty-two years after the Estes[ v. Texas, 381 U.S. 532 (1965) holding, the advances in technology and the above-described experiments have demonstrated that the stated objections [to televising hearings] can readily be addressed and should no longer stand as a bar to a presumptive First Amendment right of the press to televise as well as publish court proceedings, and of the public to view those proceedings on television.

Id. at 589.

---

[4]      It should be noted that the media has a First Amendment right to observe and report on public hearings.

Only under circumstances where audio-visual broadcasting will truly interfere with the impartiality and fairness of hearing should it be prohibited. In this case, those concerns do not arise because the hearing is a bench trial, it will likely not be widely broadcasted, and any audio-visual recording will be limited to portions of the hearing that do not involve party or witness testimony. See E*Trade, 582 F. Supp. 2d at 535. Moreover, S.D.'s impartial hearing is of significant interest to the public. Finally, Your Honor should value accurate reporting on the impartial hearing, which is bolstered by audio-visual broadcasting. In sum, audio-visual broadcasting is in the best interest of all parties involved in this case.

## CONCLUSION

Parent requests an immediate order granting S.D. an "open hearing" with the attendance of media members who will record and/or broadcast her October 16, 2018 impartial hearing using audio-visual equipment.

Dated: October 11, 2018

Respectfully submitted,

/s/

_____
Moshe Indig, Esq.
Attorney for Parent
Brain Injury Rights Group
50 W. 97th St., Suite 1E
New York, NY 10025